UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:18-CR-34 |
| | ) | |
| vs. | ) | |
| | ) | |
| BRANDON LEE ALEXANDER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

Defendant, Brandon Lee Alexander ("Alexander"), has filed eight Motions to Suppress and corresponding Memorandums in Support [Docs. 138-149, 310-313]. The United States filed three Responses [Docs. 325-327]. This matter is before the Court pursuant to 28 U.S.C. 636(b) and the standing orders of the District Court for a Report and Recommendation. On December 14, 2018, the Court conducted an evidentiary hearing on Defendant's motions. Because one of Defendant's subpoenaed witnesses did not appear at the hearing, the Court continued the hearing until Wednesday, December 19, 2018 for the witness to appear and testify. Present at the hearing were Defendant, his counsel Jerry Laughlin, Assistant United States Attorney J. Christian Lampe, and Special Assistant United States Attorney Thomas McCauley. Testifying at the hearing were Detective Pete Shockley, Officer Matt Webb, Defendant, and Lindsey Ratliff.

This matter is now ripe for resolution. For the reasons stated herein, the undersigned RECOMMENDS Motions One, Five, Six, Seven, and Eight be GRANTED as moot and Motions Two, Three, and Four be DENIED.

**I.  PROCEDURAL BACKGROUND**

On February 13, 2018, a federal grand jury returned an indictment against Alexander charging him with possessing with the intent to distribute five grams or more of methamphetamine on April

1

24, 2017 and fifty grams or more of methamphetamine on May 3, 2017 in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(B) [Doc. 3]. He was also charged with possessing a firearm in furtherance of the drug trafficking offense on April 24, 2017 and being a felon in possession of a firearm in violation of 18 U.S.C. § 924(c)(1)(A) and 922(g)(1). On June 1, 2018 and November 27, 2018, Alexander filed a total of eight Motions to Suppress [Docs. 138-149, 310-313].

Officers stopped Alexander on April 24, 2017, and May 3, 2017, for driving on a suspended license. On each occasion, they searched Alexander's vehicle and found incriminating evidence in each search. On April 24, 2017, they found a money bag with over $11,000 in cash, a large safe that was locked, a small baggie with methamphetamine, and digital scales with methamphetamine residue. On Alexander's person, they found in his waistband approximately 38 grams of methamphetamine. On May 3, 2017, during the search of the vehicle, they found, in a WD-40 container with a false bottom, 113 grams of methamphetamine.

Alexander contends that both searches of the vehicles violated his Fourth Amendment rights to be free from unreasonable searches and seizures. The United States responds that the searches were either valid consent searches or conducted pursuant to a valid written departmental directive that authorized inventory searches for impounded vehicles.

## II.    FINDINGS OF FACT

The Court makes the following findings of fact. Prior to April 24, 2017, the Morristown Police Department (MPD) was investigating Alexander and his mother for the distribution of methamphetamine. Earlier in the year, law enforcement conducted an undercover buy at Alexander's mother's residence at 712 Baker Street Morristown, Tennessee. Alexander was not present then but the confidential informant indicated that Alexander was involved in trafficking methamphetamine. Detective Gary Shockley, a narcotics and vice detective with the MPD, ran a "portal search" on

Alexander to obtain his criminal history, driver's license status, and any photographs on file. He learned that Alexander's driver's license was suspended.

On April 24, 2017, Detective Shockley was surveilling 712 Baker Street when he saw Alexander leave the residence, enter his vehicle and drive away. Detective Shockley and his partner Detective Jason Young followed Alexander approximately a half mile before making a traffic stop in front of 614 Brown Avenue, Morristown, Tennessee. This was the residence where Alexander's daughter was living.

Alexander claimed that he had pulled his vehicle off of the roadway and completely on to the gravel between the road and the yard at 614 Brown Avenue. Detective Shockley contends otherwise, testifying that the vehicle was a large SUV and it was partially stopped on the street. Detective Shockley's testimony was corroborated by the other witnesses who testified, including that of Defendant's daughter.

Detective Shockley approached the vehicle from the passenger side and saw a bank bag on the front, passenger seat and a safe on the rear, passenger side seat. Detective Shockley testified that the bank bag had a visible bulge that was consistent with the shape and size of a large stack of money. Detective Shockley asked Alexander why he was driving when he knew his license was suspended. Alexander responded that he was going to see his daughter. Detective Shockley then ordered Alexander out of the vehicle and moved him to the rear of the vehicle.

Detective Shockley asked Alexander for permission to search the vehicle. Alexander declined. He then asked Alexander about the money bag. Alexander said he was selling a car. Detective Shockley then indicated that he was going to get a drug dog to walk around the car. Alexander then stated that he was not doing anything wrong and to "go ahead and search it." Alexander disputes this testimony. He claims that he never consented to a search of his vehicle on April 24, 2017.

3

Detective Shockley testified that he was going to search the vehicle regardless of whether Alexander consented or not based on departmental policy for conducting inventory searches. That policy was introduced as Exhibit 1 at the hearing. It provides that "When a Department member causes a vehicle to be towed, that member shall completely fill out a Department Vehicle Impoundment Form…. A vehicle inventory shall be conducted in all cases where a Vehicle Impoundment Form is required." [Ex. 1, pg. 15]. Detective Shockley testified that the vehicle Alexander was driving was parked partially in a public street, creating a potential traffic hazard. He testified that he had arrested Alexander for driving on a suspended licensed and was taking him into custody. This left the vehicle unattended and partially blocking the street, requiring him to have the vehicle towed. He testified that MPD policy requires an inventory search for any vehicle that would be towed away from the scene of the stop, as was the case here. As Alexander was the only passenger in the vehicle and he was being taken into custody, the car had to be towed to avoid obstructing a public roadway.

Detectives Shockley and Jason Young searched the vehicle and found a small baggie with methamphetamine residue, digital scales with a white, crystalline residue, and a large amount of cash in the bank bag. Detective Shockley inquired to Alexander about the combination to the digital keypad lock on the safe in the backseat. Alexander said he did not know the combination and that the safe was not his.

Detective Shockley asked Alexander if he had anything illegal on his person because it was illegal to bring any contraband into the jail. Alexander initially denied having anything illegal on his person, but then, according to Detective Shockley, Alexander, who had his hands handcuffed behind his back, motioned to his waistband. Detective Shockley then retrieved approximately thirty-five grams of methamphetamine from Alexander's waistband. They transported Alexander to jail, and his car was towed and impounded.

4

Detective Shockley then completed an application for a search warrant and affidavit to obtain permission to search the safe found in Alexander's vehicle. A state judge authorized the search of the safe on April 25, 2017. During the search of the safe, detectives found a loaded pistol, Alexander's wallet, some legal paperwork, and sports cards. Detective Shockley then obtained an arrest warrant charging Alexander with possessing a firearm while being a convicted felon.

On May 3, 2017, Detectives Shockley, Young and Hickey were again conducting surveillance at 712 Baker Street in hopes of serving Alexander with the outstanding arrest warrant. Again, the detectives witnessed Alexander exit the house and drive away, this time in a Lincoln Town Car. As the detectives were in unmarked police vehicles, they requested that a nearby MPD officer make the traffic stop of Alexander. Arriving immediately at the scene of the stop, Detective Shockley informed Alexander that he was being arrested on the warrant for possessing the firearm and for driving on a suspended license. Alexander's vehicle was stopped in the middle of the street. Alexander was the only person in the car.

During the traffic stop and arrest of Alexander, Detective Shockley asked Alexander for his consent to search the vehicle. He says Alexander told him to search it. At the hearing, Alexander disputed this testimony, claiming once again that he did not consent. Instead, he claimed that Detective Shockley advised him that he "was not going through the same thing he went through the other night." In response to Detective Shockley's statement, Alexander said he told the detective "I don't care." He claims that this was not consenting to a search, but his way of saying he did not care that the detective was going to have to go through what he went through at the last traffic stop on April 24th. In any event, law enforcement searched the vehicle and found a WD-40 container in a helmet in the front passenger side floorboard. Detective Shockley picked up the container and could immediately tell this did not contain WD-40. He noticed it had a false bottom, and he unscrewed the bottom and found 113 grams of methamphetamine inside.

5

As with the April 24, 2017 search, Detective Shockley testified that he searched the vehicle because it was stopped in the middle of the street pursuant to departmental policy regarding inventory searches. He testified that the vehicle had to be towed given its location in the street and as such he had to conduct an inventory of its contents.

**III.     ANALYSIS**

**A.     Motions One, Five, Six, Seven, and Eight are moot.**

Alexander moved to suppress multiple pieces of evidence. However, none of the evidence to which these motions pertain to will be used by the United States. Motion One, [Doc. 138], is a motion to suppress evidence from a traffic stop that occurred in Grainger County, Tennessee on August 25, 2016. The United States will not be using any evidence from that stop. Motion Five [Doc. 146] is a motion to suppress any evidence seized from a search of his residence at 712 Baker Street, Morristown, Tennessee based on a search warrant obtained on May 3, 2017. The United States has indicated it will not use any evidence obtained as a result of that search. Motion Seven [Doc. 310] seeks to suppress any evidence obtained as a result of a search of Alexander's cell phone that was seized in the May 3, 2017 traffic stop. The United States has indicated it discovered no evidence it intends to use as a result of that search. Motion Eight [Doc. 312] which seeks to suppress any evidence obtained as a result of a search of 712 Baker Street based on a search warrant obtained on April 25, 2017. The United States has indicated it will not use any evidence from that search. Additionally, the United States has moved to dismiss counts One, Four, and Five of the Indictment [Doc. 328]. Therefore, by agreement of the parties, the undersigned RECOMMENDS that these motions be GRANTED as moot.

**B.     Motions Two and Three and Four [Doc. 140, 142, 144]**

In these motions, Alexander objects to the use of any evidence obtained as a result of the traffic stops on April 24 [Doc. 140] and May 3, 2017 [Doc. 142]. The Court will now turn to each

6

of these motions.

1.     **Motion to Suppress evidence from the traffic stop on April 24, 2017 [Doc. 140].**

Alexander argues that the initial stop was unconstitutional, and that during the stop, he did not consent to the search of his vehicle. He claims that the search does not fall into any other exception to the warrant requirement [Doc. 141, pg. 1-2]. The United States responds that not only did Alexander consent to the search of the vehicle, but also the stop was supported by reasonable suspicion, the search was supported by probable cause, and regardless of the other exceptions, the vehicle was subject to an inventory search before being towed [Doc. 325].

The traffic stop of Alexander on April 24, 2017 was supported by probable cause that Alexander was driving on a suspended license. Detective Shockley had determined prior to April 24, 2017, that Alexander did not have a valid driver's license. No credible evidence was presented at the hearing that contested that testimony. "It is well established that a police officer lawfully may stop a car when he has probable cause to believe that civil traffic violation has occurred, or reasonable suspicion of an ongoing crime. *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012). Here, Detective Shockley testified he knew Alexander did not have a valid driver's license and his operation of the vehicle was against the law. He had "probable cause to believe that a traffic violation [had] occurred" when Alexander drove on his suspended license. *Whren v. United States*, 517 U.S. 806, 810 (1996).

Next, Alexander claims officers did not have a right to search his vehicle because he did not consent. But the issue is not whether Alexander consented to the search but whether the search was otherwise constitutional regardless of consent. Even assuming Alexander did not consent to a search of his vehicle on April 24, 2017, that would not resolve the issue. The Court would still have to determine whether officers could nevertheless search the vehicle pursuant to an exception to the warrant requirement. *See, e.g., United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011)(law

7

enforcement may "search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime"); *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)(inventory search of a vehicle permissible without a warrant to protect the "police against claims or disputes over lost or stolen property").

The United States relies on the inventory search exception to the warrant requirement. Absent a finding of bad faith or that the sole purpose of the search was an investigation, an inventory search as part of a standardized procedure does not violate the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987). Specifically, "[t]he policy or practice governing inventory searches should be designed to produce an inventory" in hopes of protecting an owner's property while in police custody. *Florida v. Wells*, 495 U.S. 1, 4 (1990). Even in cases where the owner could make other arrangements for the transportation and storage of the vehicle, the need for an inventory is not eliminated; "the police may still wish to protect themselves or the owners of the [place of storage] against false claims of theft of dangerous instrumentalities." *Bertine*, 479 U.S. at 373. Additionally, if during a valid inventory search of a vehicle the police find contraband, the discovery gives "officers probable cause to believe there [is] contraband elsewhere in the vehicle." *Michigan v. Thomas*, 458 U.S. 259, 261-62 (1982).

Detective Shockley testified that MPD policy is for a vehicle to be towed when the vehicle has been left unattended in a designated lane of traffic on a public street or roadway and/or when an abandoned vehicle creates a traffic hazard [Ex. 1, MPD Standard Operation Procedures for Wrecker/Towing Service, pg. 14]. The departmental policy further dictates that when a vehicle is towed, the officer must fill out a Vehicle Impoundment Form. *Id*. at pg. 15. Additionally, "[a] vehicle inventory shall be conducted in all cases where a Vehicle Impoundment Form is required." *Id*. The policy even requires a Vehicle Impoundment Form "[i]f a subject who is under arrest is allowed to request a tow service." Detective Shockley stated that the reason for this procedure is to protect the

8

police department and the towing service from liability should anything be missing from the driver's vehicle when it is returned.

When Alexander was pulled over for the traffic stop, he pulled to the left-hand side of the road, at least partially onto a gravel shoulder. Alexander's vehicle was facing oncoming traffic and partially blocking the roadway. Alexander was the only occupant of the vehicle, which meant the vehicle would be left as is, obstructing the roadway, when he was transported to jail. According to the policy, the vehicle must be towed as it was obstructing traffic, meaning a Vehicle Impoundment Form must be filled out [Ex. 3], resulting in an inventory search of the vehicle. Alexander claims he should have been permitted to make alternative arrangements for someone to pick up his vehicle. But the Fourth Amendments makes no such requirement. "[A]n impoundment decision will not be impermissible simply because alternatives to impoundment might exist." *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013); *see also United States v. Kimes*, 246 F.3d 800, 805 (6th Cir.2001)(holding that officers were not required to "take[ ] it upon themselves to call [the defendant's] wife and ask her to get the vehicle"); *cf. also United States v. Agofsky*, 20 F.3d 866, 873 (8th Cir.1994) ("Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory.").

Alexander does not challenge the actual performance of the inventory search. Even if he did, it would be to no avail. The detectives testified that they conducted the inventory according to the departmental policy. Officers followed their "established routine" in conducting the inventory search of Alexander's vehicle. *Hockenberry*, 730 F.3d at 659. The Court finds that the officers properly followed the MPD policy allowing for the towing and inventory of Alexander's vehicle upon his arrest. As such, the Court RECOMMENDS this motion be DENIED.

9

**2.     Motion to suppress evidence from traffic stop on May 3, 2017 [Doc. 142]**

In this motion to suppress, Alexander denies he consented to a search of his vehicle on May 3, 2017. He claims the search was not conducted pursuant to an exception to the warrant requirement, that the search, as a result, was per se unreasonable under the Fourth Amendment. The United States claims the officers not only had consent to search the vehicle but the vehicle would be towed, subjecting it to a valid inventory search.

On May 3, 2017, the detectives were surveilling 712 Baker Street again and once again witness Alexander exit the house and get in his car and drive away. Officers stopped Alexander again as he was driving on a suspended license. Detective Shockley testified that he approached on the driver's side and advised that he was going to arrest him on the new arrest warrant for possessing the firearm and for driving on a suspended license. Alexander then claimed the gun was not his. He existed the vehicle and stepped back to the officer's truck. Detective Shockley testified that he asked for Alexander's consent to search the vehicle and Alexander gave it. Alexander disputes this, claiming he did not consent to a search. Instead, he claims he only said "I don't care." At the hearing, Alexander attempted to clarify what he meant by that, arguing that his "I don't care" statement was not in refence to the search of the car, but in reference to another statement Detective Shockley had made about "going through what he went through" during the last traffic stop. He claimed at the hearing that he neither consented or refused to consent to the search. The Court finds Alexander's attempt to clarify to be disingenuous. It also finds his testimony to be incredible regarding this issue.[1]

As with the April 24, 2017 search, the Court also finds consent not to be determinative. Once

---

[1] The Court notes that it has good reason to doubt Alexander's testimony. He claimed on cross at the hearing that he got most of his methamphetamine "for free." He also persisted in refusing to answer questions by the United States regarding the source of his funds to purchase a car or from whom he obtained his methamphetamine. "It's not relevant" was his standard reply and refused to answer.

10

again, Detective Shockley testified that Alexander's vehicle was parked in the middle of the street and was blocking traffic. Alexander was the only one in the vehicle so officers could not leave the car for someone else to drive away. Detective Shockley testified that the car had to be towed pursuant to departmental policy and that as a result, he was required to conduct an inventory. During that inventory of the vehicle, he discovered the WD-40 can, which, upon picking it up, he knew did not contain WD-40. He opened the bottom of the can and discovered 113 grams of methamphetamine. Alexander did not challenge the performance of the inventory search, and the Court finds no deficiency in the manner the detectives conducted the search. The Court finds that the vehicle was inventoried and towed as according to MPD policy. Again, no matter whether Alexander gave consent, officers did not violate Alexander's Fourth Amendment rights by searching his vehicle. Accordingly, the Court RECOMMENDS this motion be DENIED.

### 3. Motion to suppress search of safe [Doc. 144].

In this motion, Alexander seeks to suppress any evidence obtained as a result of the search of the safe found in the vehicle on April 24, 2017. First, Alexander notes the lack of signatures on the copy received in initial discovery, but the United States later provided the signed version, making the issue moot. Next, Alexander alleges that the search warrant "lacks the requisite probable cause and was so constitutionally deficient as to rend official belief in the existence of its probable cause entirely unreasonable." [Doc. 144, pg. 2]. He also alleges that the items to be seized are not described with any particularity. *Id.* at pg. 3. Finally, he argues that the officer failed to comply with Rule 41(e)(4) of the Tennessee Rules of Criminal Procedure by failing to give him "a copy of the inventory of the items found of seized as a result of the execution of such search warrant." *Id.* The United States responded in opposition, stating that there was probable cause that Officer Shockley relied on in good faith, that the warrant stated with particularity the items in the safe to be seized, that the Tennessee

11

Rules of Criminal Procedure do not apply to this proceeding, and that Alexander was served with a list of the items searched and seized [Doc. 326].

The first issue the Court notes is at the hearing Alexander claimed no interest in the safe or its contents. The Government argued that he lacks standing to challenge the search. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Am. IV. The "basic purpose of this Amendment," the Supreme Court has noted, "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Ct. of City and Cty. of San Francisco*, 387 U.S. 523, 528 (1967). Where an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). The Supreme Court has a "long history of insistence that Fourth Amendment rights are personal in nature." *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (cited approvingly in *Byrd v. United States*, ––– U.S. ––––, 138 S.Ct. 1518, 200 L.Ed.2d 805 (2018)).

Thus, "a defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated. In cases involving Fourth Amendment violations, we determine standing by deciding whether a defendant can establish a legitimate expectation of privacy in the area searched or the items seized." *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008). To determine whether Alexander's own Fourth Amendment rights have been violated, the court must examine whether he "had a legitimate expectation of privacy in the premises searched." *Byrd*, 138 S.Ct. at 1526. The Court noted that "property concepts" are instructive in this process and emphasized that "the central inquiry" often turns on the concept of "lawful possession." *Id.* at 1529. The Supreme Court noted that "a person need not always have a recognized common-law property

interest in the place searched to be able to claim a reasonable expectation of privacy in it." *Id.* at 1527. The Court went on to state that "[o]ne of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." *Id.*

Applying those concepts to this case, notwithstanding Alexander's claim that he did not own the safe, he was in rightful possession of the safe. He testified that his girlfriend had given him the property and he was keeping it for her while she received substance abuse treatment. Thus, the Court does not find the Government's claim that Alexander lacks standing to be persuasive. The Court now turns to the issues presented.

**a.     Probable Cause**

Under the Fourth Amendment of the Constitution, a warrant may only be issued "upon probable cause." A magistrate's roll in signing the search warrant is to determine with the affidavit provides "a substantial basis for determining the existence of probable cause" based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The signing magistrate and the reviewing court "must consider the veracity, reliability, and basis of knowledge" for the information in the affidavit. *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) (citing *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003).

Probable cause for a search warrant exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Mays v. City of Dayton*, 134 F.3d 809, 814 (6th Cir. 1998)(citing *Greene v. Reeves*, 80 F.3d 1101 (6th Cir. 1996). When reviewing a magistrate's determination of probable cause for a warrant, a court must give great deference to the issuing magistrate's decision and must uphold that determination unless it found to have been arbitrary. *Mays*, 134 F.3d at 814.

13

The search warrant [Ex. 4] was signed by Hamblen County General Sessions Judge Doug Collins on April 25, 2017. Detective Shockley as affiant stated that the safe had been found in the vehicle driven by Alexander, along with $11,560 in cash and digital scales, and that approximately 35 grams of methamphetamine were found on his person [Ex. 4, pg. 1]. He further stated that he "believe[d] the aforementioned facts give probable cause to believe that drugs, U.S. currency, weapons, and/or drug paraphernalia of an unlawful nature are located inside the safe." *Id*. at pg. 2. The affidavit lays out all the information as to why the officer believed contraband would be found in the safe. Based on that information, the sessions judge found probable cause. There is no basis to find otherwise.

Here, the affidavit provided specific information about what the officers found in the car and on Alexander's person that made them believe contraband would also be in the safe. Making a "practical, commonsense decision," Judge Collins could reasonably find a connection between the other items found in the vehicle and probability of similar items being found in the safe. *Gates*, 462 U.S. at 238. Therefore, the Court finds that probable cause was established.

**b.     Particularity**

Alexander alleges that the "search warrant does not describe with any particularity, or at all, the items to be seized in the search of the safe. Instead, [he alleges that] it simply authorizes the 'search of the aforementioned property [obviously the safe] for the aforementioned person…'" [Doc. 144, pg. 3] (reference to safe in original). However, the affidavit specifically lists "drugs, U.S. currency, weapons, and/or other drug paraphernalia of an unlawful nature" as items that could potentially be found in the safe [Ex. 4, pg. 2]. The search warrant itself states that the safe may be searched for "evidence pertaining [to] illegal drug possession, illegal drug sales…and possible weapons." *Id*. at pg. 3. Alexander's reference to the "aforementioned property" appears to quote the standard language of the search warrant that refers back to the more specific description provided by

14

the affiant. Therefore, the Court finds that search warrant does describe the property to be searched with particularity.

c.     **Tennessee Rules of Criminal Procedure**

Alexander next claims that Detective Shockley violated the Tennessee Rules of Criminal Procedure by failing to provide him with a "copy of the warrant and a receipt for the property." *See* Tenn. R. Crim. P. Rule 41(e)(4). This argument might have some persuasive weight in state court but it has none in federal court. It is well settled "that federal, not state, law governs the question of the validity of a search warrant in a federal criminal proceeding," specifically the Fourth Amendment. *United States v. Shields*, 978 F.2d 943, 945 (6th Cir. 1992).

> The commonly-held position is that federal, not state, law governs the question of the validity of a [state-issued] search warrant in a federal criminal proceeding." *United States v. Shields*, 978 F.2d 943, 945 (6th Cir.1992); *accord United States v. Clyburn*, 24 F.3d 613, 614 (4th Cir.1994) ("[T]he validity of a search warrant obtained by state officers is to be tested by the requirements of the Fourth Amendment of the U.S. Constitution, not by state law standards, when the admissibility of evidence in federal court is at issue."). Similarly, "in federal court, [the exclusionary rule] only requires the court to exclude evidence seized in violation of the Federal Constitution." *United States v. Wright*, 16 F.3d 1429, 1434 (6th Cir.1994). That is because the exclusionary rule "emanates from the Fourth Amendment, not state law[.]" *Id*. While the states are free to impose rules for searches and seizures that are more restrictive than the Fourth Amendment, those rules will not be enforced in a federal criminal proceeding. *Id*. Therefore, "[i]n determining whether evidence obtained solely by state officers is admissible in federal court in the first instance, it is usually irrelevant whether a state rule of criminal procedure was violated." *United States v. Maholy*, 1 F.3d 718, 721 (8th Cir.1993); *see also Virginia v. Moore*, 553 U.S. 164, 178, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) (noting that "it is not the province of the Fourth Amendment to enforce state law").

*United States v. Beals*, 698 F.3d 248, 263 (6th Cir. 2012). The Court went on to hold that "only the Fourth Amendment (to the exclusion of state law) applies in federal prosecutions involving evidence seized by state officials. So long as the Fourth Amendment is satisfied, there is no basis for suppression." *Beals,* 698 F.3d at 264. Whether or not this state procedural rule was violated, it has no impact on the Court's analysis. The standard is the Fourth Amendment and Alexander has not

15

shown any violation thereof. Therefore, the Court cannot find that there has been a violation that warrants a suppression on these grounds.

## IV. CONCLUSION

Because the undersigned finds that there has been no violation of the Fourth Amendment, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress Numbers Two, Three, and Four [Docs. 140, 142, 144] be **DENIED** for the reasons outlined herein. Additionally, based on the parties' agreement that the issues are moot, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress Numbers One, Five, Six, Seven, and Eight [Docs. 138, 146, 148, 310, 312] be **GRANTED as moot** for the reasons outlined herein.[2]

Respectfully Submitted,

s/Clifton L. Corker
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be served and filed within **ten (10) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).